IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>v.<br><br>JEREMIAH SLAYDEN,<br><br>                Defendant. | No. CR-16-0219-TUC-JGZ (DTF)<br><br>**REPORT AND RECOMMENDATION** |

Before the Court are Defendant Slayden's motion to suppress (Doc. 58) and Defendant Mize's motion for severance (Doc. 62). The government filed a response to each motion. (Doc. 67, 68.) Defendant Mize did not file a separate motion to suppress but joined in Defendant Slayden's motion to suppress (Doc. 58) without objection.

These matters came before Magistrate Judge Ferraro for a report and recommendation as a result of a referral, pursuant to LRCrim 5.1. Evidence was heard on October 5, 2016. (Doc. 72.) The Magistrate Judge recommends that the District Court, after its independent review, deny the motions.

## I. FACTUAL BACKGROUND

On January 7, 2016, at approximately 3:20 p.m., Border Patrol Agent Aaron Hughes was operating a Mobile Surveillance Capable (MSC) camera and saw a group of eight individuals cross through a hole in International Boundary Fence between Mexico and the United States. The group crossed just south of the Gringo Pass RV Park in Lukeville, Arizona. The Port of Entry is less than a half mile to the west. To the east is

1  remote desert. Except for the Port of Entry, the RV Park and one gas station, the area is
2  remote and sparsely populated. Smugglers routinely cut holes in the fence in this area to
3  cross people and narcotics into the United States illegally.  Agent Hughes could see that
4  the individuals wore camouflage clothing and carried large square shaped objects
5  consistent with the size and shape of marijuana bundles. According to agent Hughes, the
6  recorded video was less clear than what he could actually see on camera, but individuals
7  carrying large packs can be seen crossing the border and running into the RV Park.  (Ex.
8  8.) Agent Hughes described the activity to other law enforcement officers in the area over
9  his service radio. National Park Service Ranger Moses Rinck, responded to the area,
10 which was within the Organ Pipe National Monument.  Ranger Rinck parked at the gas
11 station so he could watch the paved road from the RV Park to State Route 85.
12       Meanwhile, agent Hughes continued to watch and record both the point of entry
13 and the road leaving the RV Park.  He was able to capture on video individuals running
14 back into Mexico through the same point of entry and a white utility truck leaving the RV
15 Park at about the same time.  When the white utility truck pulled out of the RV Park onto
16 State Route 85, Ranger Rinck pulled in behind the truck and followed it all the way to the
17 Border Patrol Checkpoint near mile marker 58, South of Why, Arizona.
18       While following the white utility truck, Ranger Rinck noticed a number details
19 that increased his suspicion.  There were numerous markings on the vehicle suggesting it
20 was a truck used in the electrical contracting business, but these marking appeared
21 unprofessional.  They were not painted, instead they were merely stickers, which would
22 likely peel off in the hot summer. Some of the decals were uneven.  There was a decal for
23 a website address, but it did not begin with "www." Also, the telephone number was not
24 hyphenated. (Exs. 13-18.) According to Ranger Rinck, these markings created an
25 unprofessional appearance that in his experience was atypical for a legitimate business.
26 Ranger Rinck also called the number displayed on the truck and it did not come back to
27 the business.  He then checked the vehicle registration and it did not come back to the
28 business, instead it was registered to a private individual, later identified as Defendant

1   Slaydon. Ranger Rinck notified agents at the U.S. Border Patrol checkpoint of his
2   findings and that he was following the utility truck.

3         At about 4 p.m., the white utility truck pulled into the Border Patrol Checkpoint,
4   followed by Ranger Rinck.  Border Patrol Agent Christopher Smith had been listening to
5   the radio transmissions about the events at the RV Park and Ranger Rinck's observations
6   of the utility truck he was following. Agent Smith was the agent who had the initial
7   contact with the defendants when they pulled into the checkpoint. Defendant Andrew
8   Mize was driving the truck and Defendant Jeremiah Slayden was the passenger. Agent
9   Smith asked Mize where he was coming from and Slayden said that he and Mize were
10  coming from the Gringo Pass RV Park. Slayden claimed they were electricians and had a
11  job at the RV Park. Agent Smith asked questions about the job but Slayden was unable to
12  produce a work order or the name of the person he was to do the work for. During this
13  brief questioning Slayden was the only one who responded to the agent's questions.
14  Slayden informed the agent that they were in a rush and needed to leave immediately.
15  Slayden then inquired whether they were being detained. The agent responded that he
16  was conducting an investigation and that they were being detained for that purpose.  The
17  utility truck was referred to secondary inspection.

18        As Mize maneuvered the utility truck to the secondary inspection area, Agent
19  Smith noticed fresh paint on the tool box and a large compartment in the middle of the
20  truck's cargo area that appeared inaccessible and could hold contraband.  The truck was
21  also missing a Registrar of Contractors license number, which Agent Smith typically sees
22  on contractors' vehicles.

23        At secondary inspection, Agent Smith ran a records check on the vehicle and its
24  occupants and then re-approached the truck. At this time, Slayden had his cell phone
25  camera out and began to record his interaction with the checkpoint agent. Agent Smith
26  told Slayden that a dog had been requested and that the vehicle and the defendants were
27  being detained on suspicion that the vehicle contained narcotics. He then attempted to ask
28  additional questions about their presence at the Gringo Pass RV Park and why they

1 traveled travel all the way from Mesa, Arizona, for an electrical job. Instead of answering 2 agent Smith's questions, Slayden insisted that agent Smith describe the evidence he 3 believed justified detaining him.

4 At approximately 4:40 p.m., Border Patrol Agent Jesus Araiza arrived with his 5 dog, Anouk. Anouk is trained and certified to identify controlled substances, including 6 marijuana. (Ex. 19.) Agent Araiza had been assigned to another checkpoint, 40 miles 7 north, and responded immediately when requested by agent Hughes.

8 Shortly after arriving, agent Araiza directed Anouk to conduct a free air sniff on 9 the vehicle. Slayden recorded this on his camera and the video was admitted as Defense 10 Exhibit D. According to agent Araiza, Anouk signals an alert to the presence of drugs by 11 a change in posture and or direction. This behavior can be seen on Defense Exhibit D. 12 After Anouk alerted to the presence of drugs, agent Araiza told Slayden his dog had 13 alerted, the vehicle was searched, 687 pounds of marijuana were seized and both 14 defendants were arrested.

## II. DISCUSSION

### A. Defendants' Motion to Suppress

17 Defendants moved to suppress evidence solely on the ground that law enforcement 18 officers lacked reasonable suspicion for the stop. The agents must "point to specific and 19 articulable facts which, taken together with rational inferences from those facts, 20 reasonably warrant th[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Thus, 21 reasonable suspicion is a lesser standard than probable cause. To determine the 22 reasonableness of the stop, courts must look at the "totality of the circumstances." 23 *Navarette v. California*, 134 S.Ct. 1683, 1687, 1690 (2014). The police may briefly stop a 24 moving automobile to investigate a reasonable suspicion that its occupants are involved 25 in criminal activity. *United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 83 26 L.Ed.2d 604 (1985).

27 Reasonable suspicion exists when an officer is aware of specific articulable facts, 28 that, together with rational inferences drawn from them, reasonably warrant a suspicion

that the person to be detained has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). When assessing the reasonableness of the police officer's actions, the court must consider the totality of the circumstances which confronted the officer at the time of the stop. *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

The articulable facts forming the basis of a reasonable suspicion must be measured against an objective reasonableness standard, not by the subjective impressions of a particular officer. *Gonzalez–Rivera v. I.N.S.*, 22 F.3d 1441, 1445 (9th Cir.1994). An officer is however, "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *United States v. Brignoni-Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). But the inferences drawn from an officer's experience must be objectively reasonable. *United States v. Montero–Camargo*, 208 F.3d 1122, 1131 (9th Cir.2000) (en banc).

Under the collective knowledge doctrine, a court may impute police officers' collective knowledge to the officer conducting the stop, search, or arrest. *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir.2010). So long as the officer who orders the arrest or search has knowledge of facts establishing probable cause, it is not necessary that the officers actually making the arrest or conducting the search be personally aware of those facts. *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir.2011).

In relation to stops by border patrol agents, the totality of circumstances may include:
> (1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including obvious attempts to evade officers; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and, (8) officer experience.

*United States v. Berber–Tinoco*, 510 F.3d 1083, 1087 (9th Cir.2007); *United States v. Valdes–Vega*, 738 F.3d 1074, 1079-80 (9th Cir.2013) (en banc).

Guided by these factors the Court must determine whether the factors cited by the Government in support of the stop constitute behavior that should excite the suspicion of

a trained border patrol agent that criminal activity is afoot. *See United States v. Rodriquez*, 976 F.2d 592, 595 (9th Cir.1992) (as amended by *United States v. Rodriquez*, 997 F.2d 1306 (9th Cir.1993)). With the exception of whether the dog alerted, which the Court is not considering, the facts are not in dispute.

### Characteristics of the Vehicle

Law enforcement officers collectively noticed that the white utility truck had decals instead of painted emblems, some of the emblems were not straight, and generally looked unprofessional. Ranger Rinck determined the telephone number on the truck did not come back to the business reflected on the truck and the truck was registered to an individual, not to the purported business. Agent Smith testified that the lack of a Registrar of Contractors number on the truck raised his suspicion. Agent Smith also testified that he noticed a large void area in the truck's bed that appeared to be inaccessible. This suggested to him that the bed of the truck may have been a compartment. A photograph introduced at the hearing (Ex. 14) showed that on top of the enclosure over the truck's bed a compressor was mounted such that when the bed enclosure was lifted (in an effort to access the apparent void area) the mounted air compressor would be lifted as well.

### Patterns of Traffic and Time of Day

The white utility truck was seen leaving the Gringo Pass RV Park shortly after a group of eight (8) people were seen crossing the border carrying what appeared to be large backpacks containing marijuana. Ranger Rinck had worked in the Organ Pipe National Monument since 1998 (18 years). Agent Smith testified that he had been with the U.S. Border Patrol for 7 years and had been stationed in the area for 4 years. Both Ranger Rinck and agent Smith testified to being familiar with the RV Park and knew that it employed a maintenance person to perform work in the RV Park. Agent Smith testified that he saw the RV Park maintenance person on almost a daily basis because the maintenance person passed through the Border Patrol Checkpoint as he traveled to and from the RV Park. In the entire time that they had worked in the area, neither Ranger

Rinck nor Agent Smith had ever seen anyone performing work in the RV Park except for the employed maintenance person.

**Proximity to the Border, Characteristics of the Area, and Previous Drug Smuggling**

The events began at the border under the watchful eye of the U.S. Border Patrol and followed to the checkpoint where the utility truck was stopped. A photograph entered into evidence (Ex. 5) showed that the border fence had been repeatedly cut to allow smugglers to bring the marijuana into the United States. Agent Smith testified that he has gone to the area by the border fence in issue and observed evidence of foot traffic.

**Behavior of the Occupants**

At the checkpoint the driver, Defendant Mize, did not respond to Agent Smith's questioning. Instead the passenger, Defendant Slayden, spoke to agent Smith. Slayden was uncooperative and unable to answer simple questions about what he had been doing at the RV Park. For example, Slayden was unable to state the name of the person from whom the electrical work was to be performed. Slayden also claimed to have driven from Mesa, Arizona to perform the work.

**Totality of Circumstances**

Giving due weight to the collective knowledge of the agents involved along with the reasonable inferences drawn by the officers, the Court finds that there was reasonable suspicion to believe that Defendants were engaged in illegal activity. The stop comported with the Fourth Amendment.

Before the hearing Defendant Slayden requested a continuance to hire an expert to determine whether Anouk had actually alerted during the free air search. The Court finds such an expert would be irrelevant to its determination on this issue. The agents had reasonable suspicion to stop and detain Defendants before the dog was used. Indeed, although not raised by the defense, the agents' reasonable suspicion was likely raised to probable cause when Agent Smith saw the void space in the utility truck's bed.

…

**B. Motion for Severance**

Defendant Mize has moved the Court to sever his trial from Defendant Slayden's arguing that he and Defendant Slayden's defenses are mutually antagonistic. Defendant Mize also argues that a joint trial will preclude him from cross-examining Slayden about the contents of the video recording that Slayden took of the incident and hinder him from obtaining evidence from Slayden that is purportedly on Slayden's phone. At the hearing, Defendant Slayden orally moved to join in Mize's motion to sever without an explanation of the defense that he is going to assert. The Court denied that motion to join and told Slayden that he needed to file a separate motion to sever. A motion to sever requires the Court to analyze, *inter alia*, the defenses of the two co-defendants in determining whether to sever the defendants' trial. Without knowing Defendant Slayden's anticipated defense there is no basis upon which the Court may determine that grounds for a severance have been established. Regardless, as set forth below, it is recommended that Defendant Mize's motion to sever be denied.

"There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafro v. United States*, 506 U.S. 534 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 209 (1978)). A properly joined defendant may be entitled to a severance if joinder appears to prejudice a defendant or the government. Severance should only be granted "if there is a serious risk that a joint trial would compromise a specific right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafro*, 506 U.S. at 539. "A criminal defendant is entitled to a separate trial on the ground of mutually antagonistic defenses only if the core of the co-defendant's defense is so irreconcilable with the core of his own defense that the acceptance of the co-defendant's theory by the jury precludes acquittal of the defendant." *United States v. Ortega*, 52 Fed.Appx. 626, 630 (9th Cir.2013) (quoting *United States v. Hanley*, 190 F.3d 1017, 1028 (9th Cir.1999)).

Defendant Mize states that he does not know Defendant Slayden's defense but claims that his (Mize's) defense will be mere presence. Doc. 62 at p. 4-5, ll. 22-1. The

Court cannot conclude that the core of Defendant Slayden's yet-to-be-revealed defense is so irreconcilable with the core of Defendant Mize's mere presence defense that a jury's acceptance of Slayden's theory precludes an acquittal of Mize. Even if Defendant Slayden's defense is that Defendant Mize is responsible for the marijuana being in the utility truck, it is conceivable to the Court that, assuming adequate proof, a jury could conclude that it was Mize's first day on the job for so-called Rural Electric, *i.*e., that Mize was merely present. *See Zafiro*, 506 U.S. at 539 (severance should be granted only if there is a serious risk that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence). Furthermore, Defendant Mize acknowledges the possibility, albeit with reservation about its strength, that both Defendants could non-antagonistically claim that the marijuana was already in the utility truck when they received it. *Id*. at p. 4, ll. 8-15.

Additionally, even if there is some risk of prejudice if Slayden were to claim innocence and point the finger at Mize, this is the type of risk of prejudice that the Court in *Zafiro* held could be cured with proper jury instructions. *See Zafiro*, 506 U.S. at 540-41 ("The District Court properly instructed the jury that the Government had 'the burden of proving beyond a reasonable doubt' that each defendant committed the crimes with which he or she was charged… The court then instructed the jury that it must 'give separate consideration to each individual defendant and to each separate charge against him. Each defendant is entitled to have his or her case determined from his or her own conduct and from the evidence [that] may be applicable to him or to her.'") Finally, Defendant Mize has not explained how a severance would resolve any perceived inability to effectively cross-examine Slayden concerning the video recording or how a severance would allow him to obtain the contents of Slayden's phone.

### III. RECOMMENDATION

Accordingly, it is recommended that, after its independent review of the record, the District Court **deny** Defendant's motion to suppress (Doc. 58) and **deny** Defendant's motion to sever (Doc. 62).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of this Report and Recommendation. A party may respond to the other party's objections within fourteen days. No reply brief shall be filed on objections unless leave is granted by the district court. If objections are not timely filed, they may be deemed waived.

Dated this 19th day of October, 2016.

D. Thomas Ferraro
United States Magistrate Judge